UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

ALVIN B. COOK,

               Plaintiff,

   -against-

MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
-------------------------------------------------------------- X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 0 2 2012 ★
BROOKLYN OFFICE

11-CV-479 (ARR)

NOT FOR PRINT OR ELECTRONIC PUBLICATION

<u>OPINION & ORDER</u>

ROSS, United States District Judge:

<u>Pro se</u> plaintiff, Alvin Cook, commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff seeks judicial review of the decision of the Commissioner of Social Security (the "Commissioner") that he was not disabled under the Act for the purposes of receiving Supplemental Security Income ("SSI") benefits. Now before the court is Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons explained below, the court grants the Commissioner's motion.

**I.     BACKGROUND**

Plaintiff applied for disability benefits on September 14, 2007 alleging disability based on his diagnosis of HIV, with an onset date of October 1, 2004. Complaint ("Compl.") a ¶ 4; R. 73.[1] Following a February 2, 2009 hearing at which plaintiff appeared <u>pro se</u>, R. 15-23, Administrative Law Judge Lucian A. Vecchio (the "ALJ") issued a decision, dated March 24, 2009, finding that plaintiff was not disabled under the Act. R. 9-14. The Appeals Council

---

[1] Citations to "R. __" refer to the certified administrative record.

1

denied plaintiff's request for review on November 8, 2010, making the ALJ's decision the final decision of the Commissioner on that date. R. 1-3.

   A. <u>The Hearing Before the ALJ</u>

Plaintiff, forty-seven years old at the time of his hearing, is a high school graduate who has worked in several jobs since 1979, including as a fast food manager, a service station attendant at the Army Air Force Exchange Service, and a service station manager at the Firestone Car Care Center. R. 19, 90. Most recently, plaintiff was a maintenance supervisor for a cleaning company under contract with a building from March 2002 to November 2004.[2] R. 19, 90. On September 14, 2004, however, after visiting with doctors regarding severe weight loss, pain and swelling in this wrist, and scattered healed boils on his skin, plaintiff was diagnosed with HIV and Acquired Immunodeficiency Syndrome ("AIDS"). R. 110-112. At his hearing, plaintiff testified that he stopped working in 2004 because "[t]he job that we were doing, it ended. We had a contract." R. 19. When asked why he did not get another job, plaintiff replied that he did try to get another job but was prevented by his illness which "came down . . . just about the time that the job ended." R. 20. Plaintiff explained:

> "And I was pretty sick at the time. That was – my T-cell count was about seven. So I had lost a lot of weight. And I was pretty sick. And I ended up in the hospital for about two or three days. And basically after I got out and the job had ended. I had tried to seek, you know, more employment. But as I went out looking for work and I told them about my situation, and I had, you know, doctors' appointments and so forth and so on that I had to attend, they basically weren't, you know, willing to hire me."

Id. The ALJ asked plaintiff whether, notwithstanding that employers were unwilling to hire him, he was able to perform the same work. Plaintiff responded, "Yes, I could do the work. Doing the work is not a problem." Id.

---

[2] Plaintiff's responsibilities included "order[ing] supplies to clean the building, mop heads, waxes, set up buffers for the guys. You know, make sure the staff was ready to go out every day and clean the building from top to bottom. And basically I hired them. I fired, you know—I was in charge. I was—had a pretty good supervisory job. You know, interview, hire, fire, train them, motivate them. Try to move them up." R. 20-21.

2

Asked to elaborate on his alleged disability, plaintiff testified that his illness and the required medication results in "good days" and "bad days." R. 21. Plaintiff testified that "some of the medication, every now and then, it can leave you a little groggy. . . . And if I were to be working, like during the daytime or something like that, that would pose a problem, I think. You know, on the job, I wouldn't want to be around anything machinery, anything like that." Id. Plaintiff also explained that he "could basically come down sick at any time with winters and cold weather. . . . Or you could eat the wrong thing and, you know, you can get sick pretty fast, you know, when your immune system is pretty low." Id. Finally, plaintiff related experiences in which he "got dizzy and almost passed out" and "started breaking out in hives and itching." R. 22.

B. Medical Evidence Before the ALJ

Plaintiff's relevant medical history is set forth below.

On August 27, 2004, plaintiff presented to the Kings County Hospital Center ("KCHC"), complaining of weight loss—a total of thirty-five pounds and eight pounds over the previous five months. R. 109. Plaintiff was referred for an HIV test. Id. On August 31, 2004, plaintiff went to KCHC for a follow-up appointment for treatment of wrist swelling and scattered skin boils. R. 110. He received x-rays which were unremarkable, R. 131, and was referred to the emergency room for his swelling. R. 111. On September 14, 2004, plaintiff received the results of his HIV test and was informed that he "almost certainly had AIDS" and had a CD4 count of 7.[3] R. 112. Plaintiff was scheduled for an appointment with Dr. Michael Augenbraun at KCHC on September 28, 2004. Id.

---

[3] CD4 count, often referred to as a T-cell count, refers the number of CD4+ lymphocytes in the patient's blood and helps determine how well the immune system can defend the body from infections. See Jeffcoat v. Astrue, No. 09-CV-5276 (KAM), 2010 WL 3154344, at *4, n.15 (E.D.N.Y. Aug. 6, 2010). A normal range is between 800 and 1,300, and a count below 200 indicates a compromised immune system less capable of fighting certain infections.

On November 19, 2004, plaintiff visited with Dr. Augenbraun, plaintiff's treating physician, who reported that plaintiff was now "doing fine" since he had begun Highly Active Antiretroviral Therapy (HAART) treatment. R. 113. Dr. Augenbraun noted a Viral Load of 363,[4] which he found "somewhat incredulous since [plaintiff's] CD4 count was so low." Id. Dr. Augengraun also noted plaintiff's complaint of "perirectal lesions which sounds like an abscess . . . [and] is improved with sitz baths." Id.

Though the report refers to a prior appointment in January 2005, the next record of plaintiff's treatment by Dr. Augenbraun is April 8, 2005. R. 114. Dr. Augenbraun reported that plaintiff "[f]eels well." Id. The doctor noted that in January plaintiff's viral load "was less than 50 and CD4 still in the upper 60s." Id. Dr. Augenbraun ordered a refill of plaintiff's medication, and for plaintiff to return in six weeks. Id.

The next recorded visit with Dr. Augenbraun took place on July 8, 2005, in which the doctor reported that plaintiff was "[d]oing very well on Combivir/Sustiva as well as INH prophylaxis,"[5] and scheduled a return visit in three months. R. 115.

On June 9, 2006, Dr. Augenbraun again reported that plaintiff "[f]eels fine," and that he had a viral load of less than 50 and a CD4 count over 200 at his last visit in February 2006. R. 116. The doctor noted that plaintiff was taking Combivir and Sustiva without interruption. Id. Plaintiff returned to KCHC for a flu shot on November 24, 2006, and his viral load was reported as under 50 and his CD4 count was "making its way up now at 348." R. 126. Once again, Dr. Augenbraun reported plaintiff as "doing well." Id.

---

Id.
[4] Viral Load refers to the amount of HIV virus in the blood and helps determine how quickly the HIV is replicating. See Jeffcoat, 2010 WL 3154344, at *4, n. 18. If treatment is successful, viral load can drop to low or undetectable levels. Id.

[5] Combivir and Sustiva comprise an oft-prescribed cocktail of antiretroviral regimens used to combat the progression of HIV.

4

On January 26, 2007, Dr. Augenbraun reported that plaintiff was "[f]eeling well" and had no complaints, that his last viral load was less than 50, and that his CD4 count was approximately 350. Plaintiff had been taking medication regularly, had no fever sweats or chills, was eating well, sleeping well, was not anxious or depressed, had no chest pain, and reported no other problems. Dr. Augenbraun's impression was that plaintiff's condition was "doing well" and there were no other "outstaning issues [sic]." R. 137.

July 20, 2007, Dr. Augenbraun once again reported that plaintiff was "[d]oing fine." R. 117-18. Again, plaintiff's viral load was found to be under 50, R. 139, and his CD4 count was in the low range. R. 122.

Plaintiff then visited Rachel Eyassu, M.D., on November 28, 2007, for a consultative examination in connection for his application for SSI. R. 146-48. Plaintiff reported to Dr. Eyassu that he was diagnosed with HIV in 2004, that his T-cell count is more than 300, that his viral load is undetectable, that he had no opportunistic infections, and that aside from "occasional fatigue," he had no other symptoms of his illness. R. 146 Plaintiff also reported no history of high blood pressure, diabetes, heart attack, heart disease, asthma, emphysema or seizures. Id. Dr. Eyassu noted that plaintiff cooks and cleans every day, launders twice a week, shops once a week, is able to shower, bath and dress himself, likes to watch television, listen to the radio, play chess, read, and socialize with friends. Id. In the physical examination, Dr. Eyassu noted that plaintiff suffered from "no acute distress," a normal gait, could walk without difficulty, could fully squat, had a normal stance, had no assistive devices, required no help changing clothes or getting onto and off of the exam table, and was able to rise from his chair without difficulty. R. 147. Dr. Eyassu also found that he had full strength and range of motion. Dr. Eyassu diagnosed

plaintiff with "HIV asymptomatic" and concluded that the "claimant has no medical restrictions based on today's objective findings." R. 148.

Dr. Augenbraun, plaintiff's treating physician, also completed an HIV Infection Medical Report on February 8, 2008, stating that he had treated plaintiff four times a year from August 2004 through January 2008. R. 153. Dr. Augenbraun explained that in 2004, plaintiff reported fatigue, weight loss, and thrush due to his HIV positive status, but that plaintiff had since had a "nice response" and was "much improved" following treatment with antiretrovirals. Id. Dr. Augenbraun noted that plaintiff had no current symptoms as a result of his infection and no opportunistic infection other than the thrush he complained of in 2004. R. 154. Dr. Augenbraun concluded that plaintiff had no limitations sitting, standing, walking, lifting, carrying and handling objects; travelling, understanding, remembering or carrying out instructions; or responding appropriately to supervisors, coworkers and work pressures. R. 154-55. Dr. Augenbraun indicated that he had no physical or mental limitations on work-related activities, and would not be required to miss any work due to any medical condition. R. 156-58. Dr. Augenbraun filled out a second report on October 24, 2008, coming to largely the same conclusions, and adding under the heading "current symptoms" that plaintiff was "perfectly fine". R. 163.

C. The ALJ's Decision

In his opinion dated March 24, 2009, the ALJ denied plaintiff's application for SSI on step four of the five-step sequential evaluation process for determining whether a claimant is disabled. First, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 14, 2007, the date of his application.[6] At step two, the ALJ found that plaintiff had a

---

[6] For SSI benefits, the regulations provide that the earliest month for which a claimant can be paid SSI benefits is the month following the month the claimant files the application. See Binder v. Barnhart, 207 F.Supp.2d 471, 473

severe impairment due to his HIV positive status and the "more than minimal limitations" plaintiff suffered, such as "occasional fatigue," frequent medication, and his presentment in 2004 with fatigue, thrush and weight loss. R. 11. The ALJ found, however, that the claimant did not have an impairment that "meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," and moved on to step four of the analysis. R. 12.

In step four, ALJ Vecchio concluded that plaintiff had the "residual functional capacity to perform the full range of medium work as defined in 20 CFR 416.967(c)," and that he was "capable of performing past relevant work as a maintenance supervisor for a corporate company,[7] which is a medium level of work activity." R. 12-13. The ALJ found compelling the opinion of consultative examiner, Dr. Rahel Eyassu, noting that plaintiff's only complaint was "occasional fatigue" but that plaintiff had no other symptoms. R. 12. The ALJ stated that claimant had "no history of opportunistic infections . . . [,] had not been to the emergency room in the past 12 months for an HIV related illness [,] . . . [and] appeared to be in no acute distress." Id. Further, the ALJ noted Dr. Eyassu's determination that plaintiff had a normal gait, could make a full squat and had a normal stance, used no assistive devices, was able to change for his exam and get on and off the exam table without assistance, was able to rise from his chair without difficulty, cooked and cleaned every day, did laundry twice a week and shopped once a week, was able to shower and dress himself, and enjoyed activities such as watching television, listening to the radio, reading and socializing. Id. The ALJ also took note of Dr. Eyassu's conclusion that based on the examination, "claimant had no medical restrictions." R. 13.

---

(E.D.N.Y.) (citing 20 C.F.R. § 416.335).

[7] "Corporate company" appears to be a typographical error, as plaintiff alleges that he worked as a maintenance supervisor for a "cleaning building." R. 91. The ALJ presumably meant "carpet company," as he referred to plaintiff's occupation elsewhere. R. 13.

The ALJ then examined the findings of plaintiff's treating physician, Dr. Augenbraun. Specifically, the ALJ noted Dr. Augenbraun's observation that the "only opportunistic infection that claimant had was thrush, and [that] claimant had no other symptoms and was perfectly fine." Id. The ALJ also considered Dr. Augenbraun's findings in the HIV Medical Report that "claimant had no limitations with lifting, carrying, standing, walking, sitting, pushing or pulling" and "no postural limitation, manipulative limitation, [or] limitations with understanding and memory of adaptation." Id. While plaintiff's initial symptoms when he was first diagnosed with HIV included "fatigue, weight loss and thrush," Dr. Augenbraun now reported that plaintiff "was much improved with medication and his viral load was less than 50." Id.

The ALJ also concluded from plaintiff's own statements at the hearing that plaintiff had "no significant symptoms except for some grogginess from his medications," that he could "perform his past relevant work as a maintenance supervisor," and that his "activities in daily living were within normal limits." Id. Accordingly, the ALJ found, under the fourth step of his review, that plaintiff was capable of performing his past relevant work, which represented a medium level of work activity. The ALJ concluded that "this work did not require performance of work-related activities precluded by claimant's residual functional capacity." Id. ALJ Vecchio therefore found that plaintiff "was not disabled under the Social Security Act." Id.

## II. DISCUSSION

A. Standard of Review

In order to establish disability under the Act, a claimant must prove that (1) he is unable to engage in substantial gainful activity by reason of a physical or mental impairment expected to result in death or that had lasted or could be expected to last for a continuous period of at least

8

twelve months; and (2) the existence of such impairment was demonstrated by medically acceptable clinical and laboratory techniques. 42 U.S.C. §§ 423(d), 1382(a); see also Shin v. Apfel, No. 97 CIV 8003 (RWS), 1998 WL 788780 at *5 (S.D.N.Y. November 12, 1998) (citing cases).

The SSA has promulgated a five-step process for evaluating disability claims. See 20 C.F.R. § 404.1520. The Second Circuit has characterized this procedure as follows:

> "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful employment. If he is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)) (brackets and alteration in original). The plaintiff has the burden of establishing disability on the first four steps of this analysis. On the fifth step, however, the burden shifts to the Commissioner. See Bluvband v. Heckler, 730 F.2d 886, 891 (2d Cir. 1984).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (internal citations omitted). "Substantial evidence" is "more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted). An evaluation of the "substantiality of the evidence

must also include that which detracts from its weight." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. See Tejada v. Apfel, 167 F.3d 770, 773-74 (2d Cir. 1999). Accordingly, the reviewing court may not "substitute its own judgment for that of the ALJ, even if it might have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)).

B. Review of the ALJ's Decision

In the instant case ALJ Vecchio undertook the prescribed sequential analysis and found that, while plaintiff did have a severe impairment, he retained the residual functional capacity to perform the full range of medium work, including his prior relevant work as a maintenance supervisor, since September 14, 2007, the date plaintiff's application was filed. For the reasons that follow, the court finds that the ALJ's decision is supported by substantial evidence and resulted from the proper application of legal standards.

While an ALJ must consider the medical opinions and evidence provided as to the nature and severity of an applicant's impairments, the legal determination of a claimant's residual functional capacity is reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2); see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). In this case, the ALJ properly concluded that any limitations suffered by plaintiff did not interfere with plaintiff's ability to perform medium work as it is defined for the purposes of the Act. See 20 C.F.R.§ 404.1567(c) (defining "medium work" to require "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds"); S.S.R. 83-10, 1983 WL 31251, at *6 ("A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an

8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects . . . .").

In reaching his assessment of plaintiff's residual functional capacity, the ALJ considered the medical evidence, which reported, going back to at least late 2005, that plaintiff had responded positively to anti-retroviral medications, a conclusion reached in each subsequent appointment with plaintiff's treating physician. In each visit included in the administrative record since November 2004, Dr. Augenbraun noted that plaintiff was "doing fine," "feels well," "[d]oing very well," and "feels fine." In each visit, Dr. Augenbraun also reported that plaintiff's viral load continued to diminish as his CD4+ count continued to rise above the very low count recorded at his initial diagnosis. By early 2005, plaintiff's viral count was below 50, and by early 2007, his CD4 count was approximately 350, both signs of successful treatment. See generally Jeffcoat, 2010 WL 3154344, at *4, nn.15-18 (discussing significance of CD4 count and viral load test results). No opportunistic infections were reported after plaintiff's initial diagnosis.

The ALJ also considered plaintiff's own subjective symptoms and the opinions of plaintiff's treating physician. A claimant's own statements about his or her condition, and the limitations caused by it, are not enough to establish disability. See 20 C.F.R. § 404.1529; S.S.R. 96-7p, 1996 WL 374186. The Commissioner's regulations require that an ALJ consider a claimant's observable signs and laboratory findings, as well as reported symptoms,[8] when determining whether or not a disability exists within the meaning of the regulations. 20 C.F.R. § 404.1529. The ALJ must employ a two-step analysis by first determining whether the claimant

---

[8] "A symptom is an individual's own description of his or her physical or mental impairment(s)." S.S.R. 96-7p, 1996 WL 374186, at *2.

11

has medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); see also S.S.R. 96-7p, 1996 WL 374186, at *2. Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the plaintiff's capacity to work. See 20 C.F.R. § 404.1529(c); S.S.R. 96-7p, 1996 WL 374186, at *2. Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," S.S.R. 96-7p, 1996 WL 374186, at *3, an ALJ will consider the factors listed in the regulations in assessing the credibility of a claimant's statements about his own condition.[2] 20 C.F.R. §§ 404.1529(c). "Inasmuch as it is the responsibility of the Secretary and not of a reviewing court to assess a claimant's credibility . . . and inasmuch as there is substantial evidence supporting the Secretary's assessment of [plaintiff's] credibility, that assessment should be affirmed." Battle v. Shalala, 1995 WL 312525, at *11 (S.D.N.Y. May 23, 1995) (citations omitted).

The ALJ properly completed the required two-step analysis in this case. First, he found that plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. R. 12. At the second step, however, he found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with an ability to perform the full range of medium work. Id. The ALJ pointed out the lack of any symptoms or complications of plaintiff's condition other

---

[2] The listed factors are: (i) claimant's daily activities; (ii) location, duration, frequency, and intensity of claimant's symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (v) other treatment received to relieve symptoms; (vi) any measures taken by the claimant to relieve symptoms; and (vii) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

than "occasional fatigue" as a result of medication, plaintiff's lack of physical limitations as acknowledged by his treating physician and the consultative examiner, his range of daily living activities, and his independence in self-care. R. 12-13.

In making his credibility determination, the ALJ met his obligation to consider "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3); see also Genier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010). In particular, the ALJ took into account the opinion of Dr. Augenbraun, plaintiff's treating physician, in two separate reports completed in 2008, that plaintiff had no symptoms related to his HIV status and had no limitations with "lifting, carrying, standing walking, sitting, pushing or pulling. . . . no postural limitation, manipulative limitation, [or] limitations with understanding and memory or adaptation," and was "perfectly fine." R. 13. "The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." Rosa, 168 F.3d at 78-79; 20 C.F.R. § 416.927(d)(2). An ALJ is required to provide "good reasons" to accord the opinion other than controlling weight. See Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). Only if the Commissioner explains his reasoning, and that reasoning is supported by substantial evidence, may the Commissioner discredit the opinion of a treating physician. See Snell, 177 F.3d at 133. "Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician," courts have declined to give controlling weight to those opinions where they are "not consistent with other substantial evidence in the record . . . ." Halloran, 362 F.3d at 32. "It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician may constitute such evidence." Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted).

In this case, however, the consultative examiner's opinion mirrors the opinion of the treating physician. The consultative examiner, Dr. Eyassu, made findings to those of Dr. Augenbraun, noting that plaintiff reported normal self-care habits, an active daily lifestyle, and most importantly, had no physical or mental limitations whatsoever that prevented him from working. Dr. Eyassu noted that "occasional fatigue" as a result of his medication represented plaintiff's only medical complaint. The medical evidence in the record therefore substantially supports the ALJ's conclusion.[9]

Moreover, the plaintiff's own subjective statements of his condition—namely, that he was occasionally "groggy" and that working during the daytime around machinery might prove problematic—were contradicted by his own admissions that he could perform his past relevant work as a maintenance supervisor, and that "doing the work" was not the problem. R. 20. The court therefore finds that the opinion of the treating physician, the opinion of the consultative examiner and the plaintiff's own statements, support the ALJ's conclusion that plaintiff could perform medium work.

Based on his determination that plaintiff could perform the full range of medium work as defined in 20 C.F.R. § 416.967(c), the ALJ found that plaintiff was able to perform his past relevant work as a maintenance supervisor for a cleaning company, and therefore, that he was not disabled. R. 13. Plaintiff stated that after his job ended in 2004, he tried to get a job but could not because of his illness. R. 20. Plaintiff testified, however, that his job ended not because of his illness, but because the contract the company operated under had expired at the end of 2004. R. 19. Further, as noted above, although plaintiff never resumed his occupation as a maintenance supervisor, he stated that no physical limitation prevented him from doing so. R.

---

[9] Given the well-supported and straightforward conclusions of the both the consultative examiner and the treating physician, the medical sources in the record contained no "conflict or ambiguity" that imposed a duty on the ALJ to seek additional evidence or clarification. See 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

14

20. ("Yes, I could do the work. Doing the work is not a problem.") Plaintiff had the burden of proving that he could not perform his former type of work. See 42. U.S.C. § 423(d)(2)A); 20 C.F.R. § 4041520(f); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("[T]he claimant must show that she cannot perform her former relevant work; if she does not make that showing, the claim is denied."). The court finds that there is substantial evidence to support the ALJ's decision that plaintiff did not meet this burden.

In short, while the court is sympathetic with plaintiff's HIV positive status, there is no indication in the record, either from his doctors or plaintiff himself, that plaintiff is experiencing any significant manifestations due to his HIV status. The court therefore finds that there was substantial evidence to support the ALJ's decision finding that plaintiff was not disabled under the act.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is granted, and the Commissioner's decision denying plaintiff SSI is affirmed. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/
_____
Allyne R. Ross
United States District Judge

Dated: March 2, 2012
       Brooklyn, New York

SERVICE LIST:

**Plaintiff:**

Alvin B. Cook
631 Hancock Street, Apt.# 1
Brooklyn, NY 11233